1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    WARREN CLEVELAND GREEN,                      No.  2:18-cv-1931 WBS KJN P

12                 Plaintiff,

13          v.                                      ORDER AND FINDINGS AND
                                                    RECOMMENDATIONS
14    DR. G. CHURCH, et al.,

15                 Defendants.

16

17   I.  Introduction

18          Plaintiff is a state prisoner, proceeding pro se and in forma pauperis.  Plaintiff seeks relief

19   pursuant to 42 U.S.C. § 1983.  The motion for summary judgment filed by defendant Dr. Agarwal

20   is before the court.[1]  As discussed below, defendant's motion should be granted.

21   II.  Plaintiff's Allegations

22          In his verified second amended complaint, plaintiff alleges that from 2016 through 2019,

23   he has been allowed to suffer with a bacteria/host/parasite in the skin on his face and scalp, which

24   can be seen when shaven off, and that defendant Dr. Agarwal refused to send plaintiff to an

25   outside hospital to solve this serious medical need when prescribed treatments failed.  Plaintiff's

26   new doctor, Dr. Farhat, plans to have plaintiff see a dermatologist in person rather than via

27

28   _____
     [1]  Defendant Akintola was dismissed on June 6, 2019.  (ECF Nos. 20, 29.)

                                                      1

telemedicine.  Plaintiff states that "the parasite grows every day, it burns, itches, it's irritating," and his "internal organs hurt and suffer, too."  (ECF No. 19 at 3.)   Liberally construed, plaintiff argues that Dr. Agarwal's delay in care subjected plaintiff to additional pain and suffering, as well as further potential harm due to his paralysis (ECF No. 19 at 8).[2]  Plaintiff seeks money damages, as well as an order transferring him out of the California Health Care Facility to Ironwood State Prison or some other state prison.

III.   Preliminary Matters

    A.  Plaintiff's Request for Summary Judgment

    In his opposition, plaintiff claims he is also moving for summary judgment and should be granted summary judgment in light of the 2020 Quest Diagnostics report.  However, plaintiff's opposition is not a properly-filed motion or cross-motion for summary judgment and does not comply with the requirements of Rule 56 of the Federal Rules of Civil Procedure or Local Rule 260(b).  Due to such deficiencies, the undersigned declines to construe plaintiff's unverified statements in his opposition as a motion for summary judgment.

    B.  Plaintiff's Sur-Reply

    Plaintiff filed a response to defendant's reply, and defendant filed a motion to strike the response as an unauthorized sur-reply.

    The Local Rules do not authorize the routine filing of a sur-reply.  Nevertheless, when a party has raised new arguments or presented new evidence in a reply to an opposition, the court may permit the other party to counter the new arguments or evidence.  El Pollo Loco v. Hashim, 316 F.3d 1032, 1040-41 (9th Cir. 2003).

    Here, in his reply, defendant presented the declaration of Dr. Adams to rebut the 2020 Quest Diagnostics report finding Alternaria relied upon by plaintiff in his opposition.  Thus, despite plaintiff's failure to seek leave of court to file a sur-reply is excused, and plaintiff' sur-reply is allowed and has been considered in addressing the instant motion.  Defendant's motion to strike is denied.

---

[2]  Plaintiff is a paraplegic as a result of a gunshot wound suffered prior to his incarceration.  (ECF No. 44-3 at 6-7 (Pl.'s Dep.).)

2

1    IV.  Legal Standard for Summary Judgment

2           Summary judgment is appropriate when it is demonstrated that the standard set forth in

3    Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

4    movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

5    judgment as a matter of law."  Fed. R. Civ. P. 56(a).

6                      Under summary judgment practice, the moving party always bears
                       the initial responsibility of informing the district court of the basis
7                      for its motion, and identifying those portions of "the pleadings,
                       depositions, answers to interrogatories, and admissions on file,
8                      together with the affidavits, if any," which it believes demonstrate
                       the absence of a genuine issue of material fact.
9

10   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

11   56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

12   only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

13   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

14   387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

15   Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

16   burden of production may rely on a showing that a party who does have the trial burden cannot

17   produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

18   should be entered, after adequate time for discovery and upon motion, against a party who fails to

19   make a showing sufficient to establish the existence of an element essential to that party's case,

20   and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

21   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

22   necessarily renders all other facts immaterial."  Id. at 323.

23          Consequently, if the moving party meets its initial responsibility, the burden then shifts to

24   the opposing party to establish that a genuine issue as to any material fact actually exists.  See

25   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

26   establish the existence of such a factual dispute, the opposing party may not rely upon the

27   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

28   form of affidavits, and/or admissible discovery material in support of its contention that such a

                                                    3

dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

(9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not

establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

255.  All reasonable inferences that may be drawn from the facts placed before the court must be

drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

are not drawn out of the air, and it is the opposing party's obligation to produce a factual

predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

demonstrate a genuine issue, the opposing party "must do more than simply show that there is

some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By notice filed March 27, 2020 (ECF No. 44 at 2), plaintiff was advised of the

requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil

4

1   Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (*en banc*); Klingele v.

2   Eikenberry, 849 F.2d 409 (9th Cir. 1988).

3   V.  The Civil Rights Act

4        The Civil Rights Act under which this action was filed provides as follows:

5             Every person who, under color of [state law] . . . subjects, or causes
             to be subjected, any citizen of the United States . . . to the deprivation
6             of any rights, privileges, or immunities secured by the Constitution .
             . . shall be liable to the party injured in an action at law, suit in equity,
7             or other proper proceeding for redress.

8   42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

9   actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

10  Monell v. Department of Social Servs., 436 U.S. 658 (1978) ("Congress did not intend § 1983

11  liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976) (no

12  affirmative link between the incidents of police misconduct and the adoption of any plan or policy

13  demonstrating their authorization or approval of such misconduct).  "A person 'subjects' another

14  to the deprivation of a constitutional right, within the meaning of § 1983, if he does an

15  affirmative act, participates in another's affirmative acts or omits to perform an act which he is

16  legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy,

17  588 F.2d 740, 743 (9th Cir. 1978).

18  VI.  Undisputed Facts[3] ("UDF")

19       1.  Plaintiff is housed at the California Healthcare Facility ("CHCF") in Stockton,

20  California, at all times relevant herein.  (ECF No. 44-3 at 7 (Pl.'s Dep.).)  Defendant, Dr. J.

21  Argawal, was employed as a doctor at CHCF at all times relevant herein.  (ECF No. 19 at 2.)

22       2.  Plaintiff is not and has not been a medical doctor.  (ECF No. 44-3 at 5 (Pl.'s Dep.).)

23       3.  Plaintiff is not and has not been a nurse.  (ECF No. 44-3 at 5 (Pl.'s Dep.).)

24       4.  Plaintiff is not and has not been a physician's assistant, and has had no formal medical

25  training.  (ECF No. 44-3 at 6 (Pl.'s Dep.).)

26  ////

27

28  _____
    [3]  For purposes of summary judgment, the undersigned finds these facts are undisputed.

1       5.  Plaintiff claims he developed a skin condition that was triggered by the use of shampoo

2   given to him in 2016.  (ECF No. 44-3 at 9 (Pl.'s Dep.).)

3       6.  The shampoo was prescribed by Physician Assistant (PA) Akintola.  (ECF No. 44-3 at

4   9-10 (Pl.'s Dep.).)

5       7.  PA Akintola prescribed the shampoo to address plaintiff's claim of scalp itchiness.

6   (ECF No. 44-3 at 10 (Pl.'s Dep.).)

7       8.  Plaintiff used the shampoo from December 19, 2016, until it ran out on March 27,

8   2017.  (ECF No. 44-3 at 11 (Pl.'s Dep.).)

9       9.  While plaintiff was using the shampoo, it was helping with the itchiness of his scalp.

10   (ECF No. 44-3 at 11 (Pl.'s Dep.).)

11       10.  Defendant did not prescribe the shampoo.  (ECF No. 44-3 at 11 (Pl.'s Dep.).)

12       11.  On August 17, 2017, defendant first saw plaintiff, who complained of itching over the

13   scalp going on for the last month, and stated he had used an antifungal shampoo without

14   improvement.  (ECF No. 44-3 at 46-47 (Pl.'s Dep.).)

15       12.  Defendant examined plaintiff's scalp on August 17, 2017, and plaintiff testified that

16   the doctor's "assessment was basically that he didn't see nothing.  Everything was normal."

17   (ECF No. 44-3 at 47 (Pl.'s Dep.).)

18       13.  Defendant assessed the condition of pruritus, and started plaintiff on hydrocortisone

19   cream.  (ECF No. 44-3 at 112 (Ex. 11).)

20       14.  Defendant saw plaintiff next on November 16, 2017.  (ECF No. 44-3 at 52 (Pl.'s

21   Dep.).)

22       15.  On December 6, 2017, defendant next saw plaintiff, who wanted alcohol prep for

23   cleaning the skin on his face.  (ECF No. 44-3 at 52-53 (Pl.'s Dep.).)

24       16.  On January 31, 2018, defendant next saw plaintiff, who was concerned about a fungal

25   infection of his facial and forehead skin.  (ECF No. 44-3 at 53 (Pl.'s Dep.).)

26       17.  At the January 31, 2018 appointment, plaintiff was concerned a fungal infection

27   might be invading his blood stream and causing body aches.  (ECF No. 44-3 at 53-54 (Pl.'s

28   Dep.).)

6

1    18.  Defendant noted skin pruritus and, to rule out a fungal infection, ordered a fungus

2    culture.  (ECF No. 44-3 at 55 (Pl.'s Dep.); 114-15 (Ex. 13).)

3    19.  On February 1, 2018, defendant used a scalpel to scrape a sample from plaintiff's

4    neck and sent it to the lab for a skin culture for fungus.  (ECF No. 44-3 at 14-16 (Pl.'s Dep.);

5    (ECF No. 44-3 at 85 (Ex. 2).)

6    20.  On February 13, 2018, defendant next saw plaintiff, who claimed he was more

7    concerned about the fungal infection growing into his blood.  (ECF No. 44-3 at 56 (Pl.'s Dep.);

8    116-17 (Ex. 14).)

9    21.  Plaintiff had no fever on February 13, 2018.  (ECF No. 44-3 at 57 (Pl.'s Dep.).)

10   22.  At that time, plaintiff was seriously concerned about his blood getting infected by the

11   fungus growing on his face, so defendant ordered blood work done which showed no infection.

12   (ECF No. 44-3 at 57-58 (Pl.'s Dep.); ECF No. 44-3 at 116-17 (Ex. 14).)

13   23.  On February 13, 2018, defendant informed plaintiff that it is unlikely that fungus is

14   growing in his bloodstream, and that the fungal culture was pending.  (ECF No. 44-3 at 58 (Pl.'s

15   Dep.); ECF No. 44-3 at 116-17 (Ex. 14).)

16   24.  Defendant next saw plaintiff on February 20, 2018, as a follow-up after plaintiff

17   visited the SEMS (emergency room of medical facility) four days earlier.  (ECF No. 44-3 at 58-

18   59 (Pl.'s Dep.); (ECF No. 44-3 at 118 (Ex. 15).)

19   25.  On February 20, 2018, plaintiff told defendant that plaintiff keeps shaving away the

20   thick skin and collects it to show it to others, and that he was sure this is growing in his blood.

21   (ECF No. 44-3 at 59-60 (Pl.'s Dep.); (ECF No. 44-3 at 118 (Ex. 15).)

22   26.  Plaintiff had no fever, itching, or rash at that time.  (ECF No. 44-3 at 60 (Pl.'s Dep.).)

23   27.  Plaintiff claims that what he was shaving off his face was not skin and is constantly

24   trying to get analyzed what he has placed into a specimen cup.  (ECF No. 44-3 at 60 (Pl.'s Dep.).)

25   28.  On February 20, 2018, defendant informed plaintiff that his blood work and culture

26   showed no evidence of a systemic fungal infection.  (ECF No. 44-3 at 61 (Pl.'s Dep.); ECF No.

27   44-3 at 116-17 (Ex. 14).)

28   ////

29.  Defendant next saw plaintiff on February 28, 2018, at which time he gave plaintiff the results from the fungal culture.  (ECF No. 44-3 at 61 (Pl.'s Dep.); (ECF No. 44-3 at 119 (Ex. 16).)

30.  A Quest Diagnostics report on the scraping by defendant noted "no fungal elements seen."  (ECF No. 44-3 at 17-18 (Pl.'s Dep.); (ECF No. 44-3 at 86 (Ex. 3).)

31.  The Mycology report of the February 1, 2018 scraping by Dr. Agarwal indicated "no fungal growth at four weeks."  (ECF No. 44-3 at 18-19 (Pl.'s Dep.); (ECF No. 44-3 at 87 (Ex. 4).)

32.  While plaintiff contends he did not see anything on the scalpel when defendant did the scalpel scraping, the Quest Diagnostic report indicated that the specimen quality was adequate.  (ECF No. 44-3 at 19-20 (Pl.'s Dep.); (ECF No. 44-3 at 86 (Ex. 3).)

33.  Defendant next saw plaintiff on March 27, 2018.  (ECF No. 44-3 at 62 (Pl.'s Dep.); (ECF No. 44-3 at 120 (Ex. 17).)

34.  On March 27, 2018, plaintiff told defendant that plaintiff continued to believe he was oozing out fungus infection from the pores of his facial skin.  (ECF No. 44-3 at 63 (Pl.'s Dep.); (ECF No. 44-3 at 120 (Ex. 17).)

35.  Plaintiff saw Dr. S. Hillman, physician and surgeon, on April 18, 2018, to talk about plaintiff's facial rash.  (ECF No. 44-3 at 64 (Pl.'s Dep.); (ECF No. 44-3 at 121 (Ex. 19).)

36.  Dr. Hillman noted there is no evidence of fungal nature, but because plaintiff was fixated on the idea that he has fungus on his face, ordered clotrimazole, which is a fungicidal, on the basis that if it did not work, it would be one more piece of evidence against fungus.  (ECF No. 44-3 at 65-66 (Pl.'s Dep.); (ECF No. 44-3 at 121 (Ex. 19).)

37.  Plaintiff tried the clotrimazole and it had no effect.  (ECF No. 44-3 at 66 (Pl.'s Dep.).)

38.  Defendant saw plaintiff again on May 17, 2018,[4] for complaints of eruptions over his facial skin and his skin scrapings when he shaved.  (ECF No. 44-3 at 66-67 (Pl.'s Dep.).)

39.  At the May 17, 2018 appointment, defendant requested a referral for plaintiff to see a dermatologist, principle diagnosis listed as "facial dermatitis failed multiple treatments," and the

---

[4]  In his separate statement (ECF No. 44-2 at 4), defendant uses the date May 7, 2018, but the sources cited confirm the date was May 17, 2018.

request was approved on May 25, 2018.  (ECF No. 44-3 at 23, 67 (Pl.'s Dep.); (ECF No. 44-3 at 88 (Ex. 5).)

40.  In response to defendant's request for plaintiff to see a dermatologist, on July 11, 2018, plaintiff was seen by dermatologist Dr. Hrabko, via teledermatology camera.  (ECF No. 44-3 at 23, 24, 67 (Pl.'s Dep.); (ECF No. 44-3 at 89 (Ex. 6).)

41.  Dr. Hrabko diagnosed plaintiff with Seborrheic dermatitis.  (ECF No. 44-3 at 24 (Pl.'s Dep.); (ECF No. 44-3 at 89 (Ex. 6).)

42.  Dr. Hrabko prescribed ketoconazole cream applied twice daily, indefinitely for the rest of plaintiff's life, based on his diagnosis of seborrheic dermatitis.  (ECF No. 44-3 at 24-25 (Pl.'s Dep.); (ECF No. 44-3 at 89 (Ex. 6).)

43.  Dr. Hrabko spent time trying to explain to plaintiff that seborrheic dermatitis is not something that they can cure or will go away and be gone.[5]  (ECF No. 44-3 at 25 (Pl.'s Dep.); (ECF No. 44-3 at 89 (Ex. 6).)

44.  In Discharge Documentation dated July 11, 2018, Registered Nurse Riley provided plaintiff with 11 pages of education materials on seborrheic dermatitis, which information plaintiff read.  (ECF No. 44-3 at 25-26 (Pl.'s Dep.); (ECF No. 44-3 at 90 (Ex. 7).)

45.  The education materials provided to plaintiff on July 11, 2018, indicates that the cause of seborrheic dermatitis is not known.  (ECF No. 44-3 at 27 (Pl.'s Dep.); (ECF No. 44-3 at 90 (Ex. 7).)

46.  Plaintiff was informed in the materials provided by Dr. Hrabko on July 11, 2018, that there is no cure for seborrheic dermatitis.  (ECF No. 44-3 at 29 (Pl.'s Dep.); (ECF No. 44-3 at 90 (Ex. 7).)

47.  The materials provided by Dr. Hrabko on July 11, 2018, advised that treatment, including Cortisone ointments, creams, lotions, and over-the-count and prescription shampoos,

_____

[5]  In his deposition, plaintiff testified that he did not remember Dr. Hrabko "saying all of this," and the doctor "[m]aybe wrote this down on his paper, . . . but [plaintiff] didn't have this long conversation with [Dr. Hrabko]."  (ECF No. 44-3 at 25 (Pl.'s Dep.).)  In light of plaintiff's admitted receipt of the written materials (UDF 44), the undersigned does not find the length of time the doctor may have spent explaining this to be a material dispute of fact.

can help to manage the condition.  (ECF No. 44-3 at 47-48 (Pl.'s Dep.); (ECF No. 44-3 at 90 (Ex. 7).)

48.  Plaintiff has had most or all of the symptoms of seborrheic dermatitis contained in the education materials plaintiff was provided with and read on July 11, 2018, including at the time he was diagnosed with the condition by Dr. Hrabko on July 11, 2018.  (ECF No. 44-3 at 29 (Pl.'s Dep.); (ECF No. 44-3 at 90 (Ex. 7).)

49.  Plaintiff was told that he had seborrheic dermatitis on July 11, 2018, that there was no cure, and what the treatment would be, evidenced by his signature on the materials provided in the Discharge Documentation.  (ECF No. 44-3 at 30 (Pl.'s Dep.); (ECF No. 44-3 at 90 (Ex. 7).)

50.  The day after his dermatology appointment, plaintiff saw defendant on July 12, 2018, to discuss the dermatologist's findings, namely seborrheic dermatitis.  (ECF No. 44-3 at 67, 68 (Pl.'s Dep.); (ECF No. 44-3 at 123 (Ex. 20).)

51.  Defendant started plaintiff on nystatin as recommended by Dr. Hrabko.  (ECF No. 44-3 at 69-70 (Pl.'s Dep.).)

52.  Defendant again referred plaintiff for a dermatology appointment set for September 1, 2018, but plaintiff refused the appointment.  (ECF No. 44-3 at 43-44 (Pl.'s Dep.).)  At his deposition, plaintiff explained that it was not an "actual refusal," because he does not refuse appointments, but rather there is usually a reason, for example, he is in too much pain, or has another problem and "didn't make it there."  (Id. at 44.)

53.  Defendant next saw plaintiff on September 5, 2018, at which time plaintiff indicated his skin condition had not changed and he wanted to be admitted to a hospital for a second opinion.  (ECF No. 44-3 at 70 (Pl.'s Dep.); (ECF No. 44-3 at 124 (Ex. 21).)

54.  On September 5, 2018, defendant noted plaintiff had a follow-up appointment with a dermatologist later that month and advised him to discuss it with the dermatologist then.  (ECF No. 44-3 at 71 (Pl.'s Dep.); (ECF No. 44-3 at 124 (Ex. 21).)

55.  In an appointment with Nurse Ybarra on September 18, 2018, plaintiff advised that he did not believe the diagnosis of a dermatologist who diagnosed him with dermatitis.  (ECF No. 44-3 at 49-50 (Pl.'s Dep.); (ECF No. 44-3 at 113 (Ex. 12).)  In his deposition, plaintiff explained

that at first he went with the dermatitis diagnosis, but after reading about dermatitis, believed his problem was not dermatitis because it is "worse than that.  I'm getting some germ out of my pores," different from a rash.  (ECF No. 44-3 at 49.)  Plaintiff now believed that the shampoo was entering his pores and getting into his body and the germ is causing a systemic infection, "doing damage now, . . . but it's not an infection that's going to kill me right away."  (ECF No. 44-3 at 49-50 (Pl.'s Dep.); (ECF No. 44-3 at 113 (Ex. 12).)

56.  Nurse Ybarra's examination on September 18, 2018, found no lesions or any other impairments of skin integrity.  (ECF No. 44-3 at 50-51 (Pl.'s Dep.); (ECF No. 44-3 at 113 (Ex. 12).)

57.  On September 18, 2018, Nurse Ybarra made mental health referrals for plaintiff because of his delusion that he would not accept what the doctors were saying.  (ECF No. 44-3 at 51 (Pl.'s Dep.); (ECF No. 44-3 at 113 (Ex. 12).)

58.  Defendant saw plaintiff next on October 1, 2018, in plaintiff's cell because plaintiff refused to come out.  (ECF No. 44-3 at 71, 72 (Pl.'s Dep.); (ECF No. 44-3 at 125-26 (Ex. 22).)

59.  Plaintiff had refused a dermatology appointment and refused to accept blood test results, which showed he had no infection, instead insisting that he had a generalized blood infection due to skin fungal infection spreading to his body via blood.  (ECF No. 44-3 at 72-73 (Pl.'s Dep.); (ECF No. 44-3 at 125-26 (Ex. 22).)

60.  Defendant informed plaintiff on October 1, 2018, that there was no indication that he had an ongoing bloodstream infection and there was no reason to send him to the hospital.  (ECF No. 44-3 at 74 (Pl.'s Dep.); (ECF No. 44-3 at 125-26 (Ex. 22).)

61.  Defendant saw plaintiff next on October 9, 2018, with an addendum on October 11, 2018, where plaintiff was concerned about a bloodstream infection, and defendant informed plaintiff he did not have a bloodstream infection because his blood tests showed no evidence of infection and he had no clinical features of infection.  (ECF No. 44-3 at 74-75 (Pl.'s Dep.); (ECF No. 44-3 at 127 (Ex. 23).)

62.  Because plaintiff had refused a dermatologist appointment, defendant ordered another appointment.  (ECF No. 44-3 at 75 (Pl.'s Dep.); (ECF No. 44-3 at 127 (Ex. 23).)

63.  Plaintiff saw defendant again on October 31, 2018, when plaintiff complained that his fungal infection had not gotten any better and had stopped using the ketoconazole recommended by the dermatologist.  (ECF No. 44-3 at 75-76 (Pl.'s Dep.); (ECF No. 44-3 at 128 (Ex. 24).)

64.  Defendant told plaintiff he needed to continue using the ketoconazole because the dermatologist had instructed him to.  (ECF No. 44-3 at 76-77 (Pl.'s Dep.).)

65.  Plaintiff's next dermatology appointment was with Dr. Hrabko on November 9, 2018, again via teledermatology camera. (ECF No. 44-3 at 75 (Pl.'s Dep.); (ECF No. 44-3 at 101 (Ex. 8).)

66.  Dr. Hrabko again diagnosed seborrheic dermatitis and angular cheilitis.  (ECF No. 44-3 at 31 (Pl.'s Dep.); (ECF No. 44-3 at 101 (Ex. 8).)

67. Dr. Hrabko prescribed ketoconazole cream and nystatin cream for Green's seborrheic dermatitis.  (ECF No. 44-3 at 32 (Pl.'s Dep.); (ECF No. 44-3 at 102 (Ex. 9).)

68.  In plaintiff's second visit with Dr. Hrabko on November 9, 2018, he was again given education materials on seborrheic dermatitis indicating the cause is not known, listing the symptoms which were the same symptoms from his July 11, 2018 visit which plaintiff agreed he had, that there was no cure, and that treatment can help to manage symptoms.  (ECF No. 44-3 at 33-34 (Pl.'s Dep.); (ECF No. 44-3 at 102 (Ex. 9).)

69.  Plaintiff signed as having received the education materials on November 9, 2018. (ECF No. 44-3 at 34 (Pl.'s Dep.); (ECF No. 44-3 at 102 (Ex. 9).)

70.  Defendant saw plaintiff on November 21, 2018, after the dermatology visit.  (ECF No. 44-3 at 77 (Pl.'s Dep.); (ECF No. 44-3 at 128 (Ex. 24).)

71.  Defendant discussed the dermatologist's finding of seborrheic dermatitis and its treatment with plaintiff.  (ECF No. 44-3 at 77 (Pl.'s Dep.); (ECF No. 44-3 at 128 (Ex. 24).)

72.  The last day plaintiff saw defendant was November 28, 2018, at which time it was noted that plaintiff had seen the dermatologist who diagnosed him with seborrheic dermatitis. (ECF No. 44-3 at 77, 78-79 (Pl.'s Dep.); (ECF No. 44-3 at 130 (Ex. 25).)

73.  On November 28, 2018, plaintiff told defendant that plaintiff believed whitish material he was scraping from his face every day was a fungal infection, and he wanted to be sent

out to a hospital for a skin biopsy.  (ECF No. 44-3 at 79-80 (Pl.'s Dep.).)

74.  Plaintiff wanted to prove he had a fungus.  (ECF No. 44-3 at 80 (Pl.'s Dep.).)

75.  Plaintiff had no fever or chills, he had had blood tests done multiple times and they never showed evidence of an infection, and plaintiff had been treated multiple times with antifungal creams that had no effect, meaning it was not a fungus.  (ECF No. 44-3 at 80-81 (Pl.'s Dep.).)

76.  What defendant knew on November 28, 2018, was that no blood work showed any kind of infection, that a fungal culture showed no fungal infection, and plaintiff was seeing a dermatologist regularly.  (ECF No. 44-3 at 80 (Pl.'s Dep.).)

77.  Defendant's plan on November 28, 2018, the last time he saw plaintiff, was to continue nystatin twice a day as per instruction of the dermatologist, he informed plaintiff that he did not have a fungal infection, and there was no indication for him to be sent out for a biopsy, and ordered a follow-up in 30 days. (ECF No. 44-3 at 81 (Pl.'s Dep.); (ECF No. 44-3 at 130 (Ex. 25).)

78.  Thereafter, plaintiff was seen by dermatologist Dr. Ely on July 1, 2019, via telemedicine dermatology.  (ECF No. 44-3 at 35 (Pl.'s Dep.); (ECF No. 44-3 at 111 (Ex. 10).)

79.  Plaintiff's complaint when he saw Dr. Ely was that the shampoo prescribed in 2016 caused him to have a bacteria in his pores secondary to the use of Selsun shampoo.  (ECF No. 44-3 at 35 (Pl.'s Dep.); (ECF No. 44-3 at 111 (Ex. 10).)

80.  At the time plaintiff saw Dr. Ely, plaintiff told him he was shaving his beard area every day, dry, with no soap and water.  (ECF No. 44-3 at 35 (Pl.'s Dep.); (ECF No. 44-3 at 111 (Ex. 10).)

81.  Plaintiff also told Dr. Ely that plaintiff was putting his shaving detritus in a plastic bottle that he brought in to show Dr. Ely.  (ECF No. 44-3 at 36 (Pl.'s Dep.); (ECF No. 44-3 at 111 (Ex. 10).)

82.  At the time plaintiff saw Dr. Ely, plaintiff had already had a fungal culture done by Dr. Agarwal that was negative.  (ECF No. 44-3 at 36 (Pl.'s Dep.)

83.  Dr. Ely assessed plaintiff as "delusional about what was happening to his skin, but it

13

is based on lichenification of the skin caused by shaving dry without soap and water.  The friction causes the pigmentation and texture changes."  (ECF No. 44-3 at 36-37 (Pl.'s Dep.); (ECF No. 44-3 at 111 (Ex. 10).)

84.  Dr. Ely explained to plaintiff that shaving his skin dry could cause problems because he had dermatitis.  (ECF No. 44-3 at 37 (Pl.'s Dep.); (ECF No. 44-3 at 111 (Ex. 10).)

85.  Dr. Ely, the second dermatologist plaintiff had seen, and plaintiff's third dermatology visit, did not diagnose plaintiff as having any bacteria or fungus in his pores.  (ECF No. 44-3 at 37-38 (Pl.'s Dep.); (ECF No. 44-3 at 111 (Ex. 10).)

86.  Plaintiff believes that the shampoo prescribed in 2016 by PA Akintola is the cause of his claimed skin problems.  (ECF No. 44-3 at 12 (Pl.'s Dep.).)

87.  No doctor has ever told plaintiff that the shampoo prescribed in 2016 by PA Akintola is the cause of his skin problems.  (ECF No. 44-3 at 12 (Pl.'s Dep.).)

88.  As of January 6, 2020, when plaintiff was deposed, there was nothing in plaintiff's medical records showing that he has any fungus.  (ECF No. 44-3 at 40 (Pl.'s Dep.).)

89.  The fungus culture sent by defendant Dr. Agarwal showed no fungus.  (ECF No. 44-3 at 40 (Pl.'s Dep.).)

90.  There is nothing in plaintiff's medical records showing that he has any bacterial infection.  (ECF No. 44-3 at 39 (Pl.'s Dep.).)

91.  No medical provider plaintiff has seen since 2016 has told him that he has some kind of bacterial infection in his skin.  (ECF No. 44-3 at 39 (Pl.'s Dep.).)

92.  No dermatologist told plaintiff that he has a fungus or bacteria in his pores.  (ECF No. 44-3 at 38 (Pl.'s Dep.).)

93.  From 2016 to January 6, 2020, all dermatologists plaintiff has seen have told him he has dermatitis.  (ECF No. 44-3 at 39 (Pl.'s Dep.).)

94.  Doctors have told plaintiff his condition is dermatitis, with none telling him he has some kind of fungus.  (ECF No. 44-3 at 21, 22 (Pl.'s Dep.).)

95.  Plaintiff claims that what he claims as an abnormality is a parasite, fungus, and a germ in his skin that he has to figure out a way to get rid of.  (ECF No. 44-3 at 40 (Pl.'s Dep.).)

14

96.  What the dermatologists have diagnosed as dermatitis, plaintiff calls a "germ," "an abnormality," "parasite," "something that's . . . not a part of me."  (ECF No. 44-3 at 40 (Pl.'s Dep.).)

97.  Plaintiff believes he has a parasite in his skin, his pores.  (ECF No. 44-3 at 41 (Pl.'s Dep.).)

98.  Plaintiff speculates that this germ is in his skin so it has access to his blood stream and is inside him.  (ECF No. 44-3 at 41 (Pl.'s Dep.).)

99.  Plaintiff believes he has an infection, a germ, but not the type that is going to kill him right away, but it is doing damage now.  (ECF No. 44-3 at 50 (Pl.'s Dep.).)

100.  Plaintiff was not willing to accept the diagnosis of dermatologists or the opinion of his primary care provider because if plaintiff has germs coming out of his face and doctors are telling plaintiff nothing is wrong with him and they do not see anything, there is a conflict between him and them.  (ECF No. 44-3 at 50 (Pl.'s Dep.).)

101.  Plaintiff has a difference of opinion from that of his physicians.  (ECF No. 44-3 at 50 (Pl.'s Dep.).)

102.  In the education materials plaintiff received from dermatologist Dr. Hrabko, it advised that there is no cure for seborrheic dermatitis, but it can be managed by cortisone, steroid ointments, creams, and lotions, and over-the-counter prescription shampoos, and once defendant knew the diagnosis, that is what defendant prescribed for plaintiff.  (ECF No. 44-3 at 84 (Pl.'s Dep.); (ECF No. 44-3 at 90 (Ex. 7).)

103.  [intentionally left blank][6]

104.  Plaintiff blames PA Akintola for plaintiff's skin problem because PA Akintola prescribed the shampoo that plaintiff believes caused the problem, but the courts dismissed PA Akintola so plaintiff is stuck with defendant Dr. Agarwal, but plaintiff does not blame defendant Dr. Agarwal for plaintiff's skin problem because Dr. Agarwal is not a dermatologist.  (ECF No.

---

[6]  Defendant included as UDF 103:  "If it were up to plaintiff, he would be blaming PA Akintola because he's the one who prescribed the shampoo, citing plaintiff's deposition at 30:23-24. However, page 30 of plaintiff's deposition was not scanned into the court's electronic docket, and was likely not provided to plaintiff.

1    44-3 at 82-83 (Pl.'s Dep.).)

2          105.  When plaintiff brought to defendant's attention that he had a skin problem,

3    defendant recommended plaintiff see a dermatologist.  (ECF No. 44-3 at 13 (Pl.'s Dep.).)

4          106.  Plaintiff does not fault defendant since defendant is not a dermatologist, was

5    following recommendations from dermatologists, and made the referrals, did blood work, and did

6    the fungus culture.  (ECF No. 44-3 at 83 (Pl.'s Dep.).)

7          107.  Plaintiff does not hold defendant fully responsible.  (ECF No. 44-3 at 83 (Pl.'s

8    Dep.).)

9          108.  Plaintiff believes defendant was trying to help him with his condition.  (ECF No. 44-

10   3 at 14 (Pl.'s Dep.).)

11         109. [7]  On December 16, 2019, via telemedicine, dermatologist Dr. Ely saw plaintiff, who

12   told Dr. Ely that plaintiff had a "cup of 'fungus'" he wanted Dr. Ely to analyze, indicating

13   plaintiff had shaved it off his face.  (ECF No. 49 at 7, ¶ 4 (Dr. Adams' Decl.); ECF No. 49 at 10

14   (Ex. A).)  Plaintiff did not have the cup with him, but complained of burning and itching of the

15   face not relieved by multiple antifungal creams and hydrocortisone.  (Id.)  On exam, Dr. Ely

16   noted plaintiff's skin was "essentially normal skin of the face," with "no lesions suggestive of a

17   'fungus' infection."  (Id.)  When told Dr. Ely could not see anything, plaintiff said it was because

18   he "shaved the fungus off."  (Id.)  Dr. Ely diagnosed pruritis, noting "clearly this is not a

19   dermatophyte infection and analysis of skin debris will show nothing."  (Id.)

20         110.  On February 10, 2020, via telemedicine, Dr. Ely again saw plaintiff, who

21   complained of "stuff coming out of my pores," and that it had been occurring since 2016.  (ECF

22   No. 49 at 7, ¶ 5 (Dr. Adams' Decl.); ECF No. 49 at 11 (Ex. B).)  Plaintiff claimed he was using

23   Calamine lotion and had tried numerous topical steroids and antifungals.  (Id.)  Plaintiff brought

24   with him a plastic jar full of epidermal debris, which plaintiff claimed he got off his face using a

25   dry shave technique with his razor, and wanted it analyzed.  (Id.)  Dr. Ely's assessment was

26

27   [7] UDF 109 - 111 were provided as background to Quest Diagnostic's February 23, 2020 Report
     included with plaintiff's opposition.  Following review of the briefing, including plaintiff's sur-
28   reply, the undersigned also finds such facts to be undisputed.

1  "clinically this looks like seborrheic dermatitis," and "the scaling is suggestive of tinea faciel."

2  (Id.)  Because plaintiff insisted, Dr. Ely sent the jar and its contents for culture.  (Id.)

3       111.  On February 23, 2020, Quest Diagnostics issued its report on the culture of the

4  contents of plaintiff's cup.  (ECF No. 49 at 8, ¶ 7 (Dr. Adams' Decl.); ECF No. 49 at 15 (Ex. C.).)

5  The reported result:  Alternaria species.  (ECF No. 49 at 15 (Ex. C.).)  The report references client

6  Dr. Singh.  (Id.)

7  VII.  Defendant's Motion for Summary Judgment

8       A.  Legal Standards Governing Medical Claims

9       Deliberate indifference to a serious medical need violates the Eighth Amendment's

10  proscription against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104

11  (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds,

12  WMX Techs, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  A determination of

13  "deliberate indifference" involves an examination of two elements:  the seriousness of the

14  prisoner's medical need and the nature of the defendant's response to that need.  See McGuckin,

15  974 F.2d at 1059.

16       A "serious medical need" exists if the failure to treat the injury or condition "could result

17  in further significant injury or the 'unnecessary and wanton infliction of pain.'"  Jett v. Penner,

18  439 F.3d 1091, 1096 (9th Cir. 2006) (quoting McGuckin, 974 F.2d at 1059).

19       An official acts with deliberate indifference if he "knows of and disregards an excessive

20  risk to inmate health or safety; to satisfy the knowledge component, the official must both be

21  aware of facts from which the inference could be drawn that a substantial risk of serious harm

22  exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).

23  Also, "[p]rison officials are deliberately indifferent to a prisoner's serious medical needs when

24  they deny, delay, or intentionally interfere with medical treatment," Hallett v. Morgan, 296 F.3d

25  732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to

26  respond to a prisoner's pain or possible medical need.  Jett, 439 F.3d at 1096.

27       Deliberate indifference is a higher standard than negligence or lack of ordinary due care

28  for the prisoner's safety.  Farmer, 511 U.S. at 835.  Medical malpractice or negligence does not

support a cause of action under the Eighth Amendment.  Broughton v. Cutter Labs., 622 F.2d 458, 460 (9th Cir. 1980) (per curiam).  Moreover, a delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm.  McGuckin, 974 F.2d at 1060.  Additionally, there is no constitutional right to an outside medical provider of one's own choice.  See Roberts v. Spalding, 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution.").

Furthermore, "Eighth Amendment doctrine makes clear that "[a] difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference."  Hamby v. Hammond, 821 F.3d 1085, 1092 (9th Cir. 2016) (internal quotations and citations omitted) (evaluating merits of Eighth Amendment claim in context of qualified immunity).  Difference in opinion amounts to deliberate indifference only when the course of treatment chosen is "medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk to plaintiff's health."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).  Only conduct characterized by "obduracy and wantonness" amounts to deliberate indifference under the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986).  The action must rise to a level of "unnecessary and wanton infliction of pain."  Estelle, 429 U.S. at 105.

B.  Discussion

Solely for purposes of summary judgment, defendant does not dispute that plaintiff's skin condition constitutes a serious medical condition.  Thus, the sole issue here is whether defendant Dr. Agarwal was deliberately indifferent.

Following review of the evidence, the undersigned finds that defendant adduced evidence demonstrating he was not deliberately indifferent.  First, the evidence shows that defendant treated plaintiff on multiple occasions and did not unduly delay plaintiff's treatment.  Plaintiff initially saw defendant on August 17, 2017, over four and a half months after plaintiff stopped using the shampoo prescribed by PA Akintola.  (UDF 8, 11.)  Plaintiff did not complain about a fungal infection of his face and forehead skin until January 31, 2018, and on that date, defendant

18

ordered a fungus culture, which was taken and sent for culture on February 1, 2018.  (UDF 17-19.)  In the meantime, plaintiff presented with no fever, yet complained of a fungal infection in his blood; defendant ordered blood work.  (UDF 22.)  On February 20, 2018, defendant informed plaintiff that the culture and the blood work did not show evidence of a systemic fungal infection, and on February 28, 2018, defendant gave plaintiff the results from the fungal culture showing no fungal elements.  (UDF 28, 29-30.)  On May 17, 2018, defendant requested plaintiff be referred to a dermatologist, who saw plaintiff on July 11, 2018.  (UDF 39, 40.)  Following plaintiff's refusal to again see the dermatologist, defendant ordered another dermatologist appointment.  (UDF 62.)  Defendant last saw plaintiff on November 28, 2018, noting plaintiff did not have a fungal infection, there was no indication for plaintiff to be sent out for biopsy, and ordered a follow-up in 30 days.  (UDF 72, 77.)  At that time, dermatologist Dr Hrabko had diagnosed plaintiff as having seborrheic dermatitis, for which there is no cure, but could only be managed by treatment, including Cortisone ointments, creams, lotions, and over-the-counter and prescription shampoos.  (UDF 41, 42, 43, 46, 47.)

Second, it is undisputed that other medical professionals agreed with defendant's medical opinion that plaintiff did not suffer from a fungal infection of his facial skin.  Dr. Hillman found no evidence of a fungal nature, but prescribed clotrimazole topical, a fungicidal, to rule fungus out, and the clotrimazole had no effect.  (UDF 35, 36, 37.)  The dermatologist Dr. Hrabko did not diagnose plaintiff as having a fungal infection, but rather seborrheic dermatitis.  (UDF 43.)  Importantly, Dr. Ely explained to plaintiff that shaving his skin dry could cause problems because he had dermatitis (UDF 84), and Dr. Adams confirmed plaintiff "repeatedly indicated he was dry shaving his face, contrary to medical instructions not to dry shave."  (ECF No. 49 at 8.)  Indeed, two medical providers deemed plaintiff "delusional" for his refusal to believe the dermatitis diagnosis.  (UDF 57, 83.)

Third, defendant's evidence demonstrates defendant did not act with a culpable state of mind.  Even when defendant doubted plaintiff had a fungal infection, defendant took a scraping and had the sample cultured.  Plaintiff's unverified claim that the scalpel contained no specimen is rebutted by the Quest Diagnostic report finding the specimen adequate.  (UDF 32.)  Moreover,

despite the culture showing no fungal infection, defendant went ahead and provided plaintiff with antifungal medication.  On November 28, 2018, the last time defendant saw plaintiff, defendant knew a dermatologist diagnosed plaintiff with seborrheic dermatitis, plaintiff was seeing a dermatologist regularly, and physical exams of plaintiff, his blood work, and fungal culture showed no fungal infections.  (UDF 72, 76.)  Even in his deposition, plaintiff conceded that defendant is not a dermatologist yet tried to help plaintiff.  (UDF 108; see also 104, 106, 107.)

Fourth, in response to the 2020 culture showing Alternaria, defendant provided the declaration of Dr. Anise Adams[8] who explained that "Alternaria is a plant pathogen -- a fungus that occurs primarily on plants and in soil," and "it does not generally infect the skin of an immunocompetent patient."  (ECF No. 49 at 8, ¶ 8 (Dr. Adams' Decl.).)  Dr. Adams opined that "it is most likely that it was a contaminant in the sample jar of detritus provided by [plaintiff], and not something actually on [plaintiff's] skin."  (ECF No. 49 at 8.)  Dr. Adams questioned the integrity of the sample based on Dr. Ely's failure to take a scalpel scraping and place it into a sterile container, as well as the inability to determine the circumstances of plaintiff's collection of the sample.  (ECF No. 49 at 8, ¶ 6 (Dr. Adams' Decl.).)  Indeed, at plaintiff's January 6, 2020 deposition, plaintiff described a bag he brought with him as "a plastic bag with a specimen accompanied in it and it's the stuff I shave off my face."  (ECF No. 49 at 16-17, ¶ 2 (Whitney Decl.); ECF No. 49 at 20, 21 (Pl.'s Dep.).)  Plaintiff testified, "I'm trying to get the doctor in the unit I'm in, Dr. Singh, to have it analyzed," and "I grow some type of fungus on my face and I shave it off and I put it in this specimen cup."  (ECF No. 49 at 20, 21 (Pl.'s Dep.).)  As early as 2018, plaintiff was dry shaving and collecting epidermal debris in a plastic specimen cup.  (UDF 25 & 27.)

In any event, the 2020 culture reporting Alternaria fails to demonstrate a link between defendant, who last treated plaintiff in November of 2018, and the 2020 report.  As noted above, defendant took a sample from defendant in February of 2018 using a sterile procedure, yet the resulting culture showed no fungal infection.  Dr. Adams confirmed that the Alternaria noted in

[8] Dr. Anise Adams is a medical doctor licensed by the State of California, currently employed as the Chief Medical Executive for the California Health Care Facility.  (ECF No. 49 at 6.)

1   the 2020 report "does not substantiate any medical correlation between [plaintiff's] skin condition

2   and the treatment by Dr. Agarwal years before, most especially since nothing in [plaintiff's]

3   medical records shows he has ever had any fungus."  (ECF No. 49 at 8.)  Moreover, "[i]n the rare

4   circumstances that Alternaria was on [plaintiff's facial skin, treatment would involve antifungal

5   medication, which had been tried on [plaintiff's] numerous times over the years, to no effect."

6   (Id.)

7            In light of the above evidence, the undersigned finds that defendant has met his initial

8   burden to cite evidence in support of his assertion that there is no genuine dispute of material fact

9   as to whether defendant Dr. Agarwal was deliberately indifferent to plaintiff's serious medical

10   needs.

11            Thus, the burden shifts to plaintiff to demonstrate defendant was deliberately indifferent.

12            A plaintiff's verified complaint may be considered as an affidavit in opposition to

13   summary judgment if it is based on personal knowledge and sets forth specific facts admissible in

14   evidence.  Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000).  In his February 22, 2019

15   second amended complaint, the statements based on his own personal knowledge are that he was

16   not taken to an outside hospital, that he was treated with solutions and medicated creams by

17   doctors at CHCF that "didn't work/failed," and his face or facial skin "burns and itches," and also

18   states that "dermatitis is just more irritation and pain at times."  (ECF No. 19 at 3, 4, 8.)  Such

19   statements, standing alone, are insufficient to rebut the medical evidence set forth above.  It is

20   undisputed that plaintiff was not taken to an outside hospital, but he was seen by two outside

21   dermatologists by telemedicine on several occasions.  As noted above, plaintiff does not have a

22   constitutional right to medical care outside of that provided within the prison.  See Roberts, 783

23   F.2d at 870.  On this record, the fact that plaintiff was not taken to an outside hospital does not

24   constitute a material dispute of fact precluding summary judgment.

25            In opposition, the only competent evidence plaintiff provided is the February 23, 2020

26   Quest Diagnostics Report showing the culture result as "Alternaria species."  (ECF No. 48 at 7.)

27   However, taking such report as true, plaintiff submitted no evidence linking defendant to this new

28   report.  As argued by defendant, defendant last treated plaintiff in November of 2018; thus,

21

1    defendant could not have been aware of such finding.  Plaintiff offers no competent evidence

2    refuting Dr. Adams' declaration that there is no medical correlation between the 2020 culture

3    results and defendant's medical treatment years prior.  Therefore, even assuming plaintiff did

4    have Alternaria on his facial skin in February 2020, plaintiff has not demonstrated that defendant

5    knew of such condition and disregarded it.

6         Further, despite being provided notice of the requirements for opposing a motion for

7    summary judgment, plaintiff did not provide his own declaration or other evidence showing

8    defendant was deliberately indifferent during the time defendant treated plaintiff.  (ECF Nos. 23

9    (court notice), 44 (contemporaneous notice), (ECF No. 47 (court reminder).)[9]  Plaintiff clearly

10   disagrees with defendant's finding that plaintiff did not suffer from a fungal infection of his skin,

11   but a mere disagreement with his doctor does not rise to the level of deliberate indifference.

12   Hamby, 821 F.3d at 1092.  In his unverified opposition, plaintiff claims that his skin disease is

13   called Alternaria, and that "dermatitis" was a misdiagnosis by Dr. Agarwal.  (ECF No. 48 at 4.)

14   However, defendant did not diagnose plaintiff with dermatitis; rather, it was Dr. Hrabko.  (UDF

15   41.)  But even if defendant had misdiagnosed plaintiff's skin condition, medical malpractice or

16   negligent failure to diagnose a medical condition, without more, does not constitute an Eighth

17   Amendment violation.  Broughton, 622 F.2d at 460.  Plaintiff has not adduced any competent

18   evidence that defendant chose a course of treatment that was medically unacceptable and did so

19   knowing such course of treatment posed an excessive risk to plaintiff's health.  Jackson, 90 F.3d

20   at 332.

21        Based on the foregoing, the undersigned concludes that plaintiff has not raised a genuine

22   issue as to any material fact.  Therefore, summary judgment for defendant is appropriate.

23   ////

24   ////

25   _____

26   [9]  Plaintiff did cite to Log # CHCF HC 18003287 Health Care Services response report, claiming
     that the report "called his medical skin problem seborrheic dermatitis, and the PCP ["primary care

27   physician"] is Dr. Agarwal['s] October 4, 2018 report."  (ECF No. 50 at 3.)  However, plaintiff
     did not submit a copy of the Health Care Services response or the October 4, 2018 report.

28

VIII.  Injunctive Relief

In his complaint, plaintiff sought transfer away from CHCF.  However, in light of the instant findings and recommendations, plaintiff's motion should be denied.

IX.  Conclusion

Accordingly, IT IS HEREBY ORDERED that defendant's motion to strike plaintiff's sur-reply (ECF No. 51) is denied.

Further, IT IS RECOMMENDED that:

1.  Defendant's motion for summary judgment (ECF No. 44) be granted;

2.  Plaintiff's request for injunctive relief (ECF No. 19 at 9) be denied; and

3.  Judgment in favor of defendant Agarwal be entered, and this action be terminated.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  December 8, 2020

/gree1931.msj.med

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

23